STATE OF VERMONT

SUPERIOR COURT                                    ENVIRONMENTAL DIVISION

| | |
|---|---|
| Shires Housing PRD Amendment | No. 171-12-14 Vtec |
| ********************************************** | ********************************************** |
| Shires Housing Inc. Act 250 | No. 42-4-16 Vtec |

**DECISION ON THE MERITS**

These coordinated appeals relate to amendments to a municipal approval and an Act 250 permit granted to Shires Housing, Inc. (Shires Housing or Applicant) for a planned residential development (PRD).[1]  The proposed development involves the construction of 24 apartment units in seven buildings on a 2.7-acre parcel known as Lot #3, along with vehicular access, utilities, and infrastructure (the Project).  The address is generally known as Eden Way, which is between South Street and Silver Street in Bennington, Vermont.

In Docket No. 171-12-14 Vtec, a group of neighbors[2] challenge the Town of Bennington Development Review Board's (DRB) decision to issue an amended PRD permit.  In Docket No. 42-4-16 Vtec, a different group of neighbors[3] challenge the District #8 Environmental Commission's (District Commission) decision to issue an amended Act 250 permit.[4]  The Neighbors' primary concern is that the Project will have an undue adverse effect on their homes and neighborhood.  Shires Housing cross-appeals certain conditions of the amended Act 250 permit.

---

[1] Appleridge Development LLC was listed as co-permittee as the owner of the land.  Shires Housing intended to purchase the land.

[2] Appellants are David Fredrickson, Victor Milani, Kevin Callanan, Rose Wolfe, April Bernard, Daniel Amadon, Jerry Amadon, Judith Fellows-Miller, Fronia W. Simpson, Dorothy Roy, and Peter Cross. Other neighbors are interested persons in the matter: Donald R. Miller, William T. Holmes, Jeanne McKenna, Mary A. Morrissey, and Kathleen Hoisington.

[3] Appellants are David and Lorraine Fredrickson, Fronia Simpson, Marc Simpson, Jeanne McKenna, Judith Fellows-Miller, Donald Miller, Mary Morrissey, Gerald Amadon, Daniel Amadon, Dorothy Roy, William Wolfe, Rose Wolfe, Bonnie Callanan, Kevin Callanan, Vic Milani, Kathleen Milani, Margaret Fletcher, Malcolm Crosland for Royda Crosland, William Holmes, Madeleine Holmes, Peter Cross, Frederick Kennedy, and Healthy Neighborhoods MBE (by David Fredrickson, spokesperson).

[4] Although the list of Appellants are not identical in the two appeals, they pursued the appeals through the same attorney and relied on similar legal arguments.  We refer to them collectively as either Appellants or Neighbors.

Robert M. Fisher, Esq. represents the Neighbors and Mark Hall, Esq. represents Shires Housing. Gregory J. Boulbol, Esq. represents the NRB; however, the NRB did not take an active role at trial. Robert E. Woolmington, Esq. represents the Town of Bennington; however, the Town did not attend or participate at trial.

A two-day trial was held on these coordinated appeals on November 14–15, 2016 in the Bennington District Court of the Vermont Superior Court in Bennington, Vermont. Before the trial, the Court conducted a site visit at the subject property and surrounding neighborhood. While the observations and statements made during the site visit were not received as evidence, the site visit provided helpful context for the evidence that was presented at trial. The parties were permitted to file pre- and post-trial memoranda, proposed findings of fact and conclusions of law.

Based upon the evidence presented, the Court renders the following Findings of Fact and Conclusions of Law. A Judgment Order accompanies this Merits Decision.

**Findings of Fact**

1.      Shires Housing, a regional affordable housing agency located in Bennington, Vermont, proposes a 24-unit apartment complex in seven buildings on 2.7 acres on Eden Way between Silver Street and South Street in Bennington, Vermont (the Project).

2.      The Project includes five duplexes on land adjacent to Silver Street, and two apartment buildings of six and eight units located at the interior of the site west of the duplexes on the proposed extension of Eden Way.

3.      The size of the Project's lot is 2.7 acres, or 117,612 square feet.

4.      The Project, referred to as Mountain View Apartments in the siting plans and documents, received Land Use Permit #8B0573-3—the Act 250 Permit—from the District Commission on August 24, 2016. The permit was approved with conditions.

5.      The Project received PRD and zoning approval with conditions as Permit #14-141 from the DRB on November 5, 2014.

6.      The Project is a revised version of the original plan for the property proposed by Appleridge Development, LLC (Appleridge) and Hawk's Associates, LLP for 53 units on 4.4 acres.

7.      The District Commission approved the original proposal on September 27, 2005, and issued Land Use Permit #8B0573 to renovate an existing house into three condominium units and build 12 new buildings with up to five units in each.  The plan also received PRD and zoning permit approval from the DRB on August 2, 2005.

8.      In 2006, Appleridge sought and received amendments to its PRD and zoning permit, and its Act 250 permit, to downsize its proposal from 53 units to 42 units in duplexes only.  The DRB issued Permit # 06-113 for the revised plan on June 6, 2006, and the District Commission issued Permit #8B0573-1 on July 17, 2006.

9.      Appleridge built only 15 of the proposed 42 condominium units, with 12 units in 6 duplexes and 3 units in a renovated historic home.  Appleridge then sought to sell the remaining 2.7 acres of the property.

10.      The Project is designed to accommodate access by fire and rescue vehicles.

11.      The Bennington Town Manager certified that the Town has the capacity to provide fire protection, police protection, road maintenance, and solid waste disposal services without unreasonable burdens.  Municipal Impact Questionnaire, Applicant Ex. 23.

12.      The Project is conservatively expected to provide housing for as many as 12 school-aged children.  Letter from Superintendent James R. Culkeen to DRB Chairman Charles Copp and Planning Director Daniel Monks, Applicant Ex. 19; see also MSK Engineering and Design, Inc. Letter to DRB, Applicant Ex. 20.

13.      The children are likely to be concentrated in kindergarten through fifth grades.  Letter from Superintendent James R. Culkeen to DRB Chairman Charles Copp and Planning Director Daniel Monks, Applicant Ex. 19.  The additional students can be absorbed by the school district with little measurable impact.  Id.

14.      The Project is located in the Mixed Residential (MR) District.  The stated purpose of the MR District in the Town of Bennington Land Use & Development (Regulations) "is to provide suitable locations for apartment buildings, row houses and similar group housing, and planned development projects with integrated design, in order to promote the most appropriate use of land, to ensure economical provision of streets and utilities, and to secure the best possible environment for these types of dwellings."  Regulations 49, Applicant Ex. 29.

15. The Project is located two blocks south of downtown Bennington and is considered infill development.

16. The lots on Grandview Street are small, each averaging about a quarter-acre. The lots along Silver Street are up to a half-acre or slightly larger.

17. Most of the Project is interior to a block bounded by South Street, Grandview Street, Silver Street and Prospect Street. Within that block, the Project's density—measured by the number of kitchens per acre—is about average compared to the surrounding lots. See Applicant's Ex. 17.

18. The surrounding neighborhood contains a mixture of single-family homes, as well as multi-unit and duplex condominium developments, and commercial uses.

19. Nathaniel Court, a 42-unit condominium complex on a site smaller than the project site proposed here, is on South Street, just south of the Project. The 15-unit Appleridge condominium development is immediately adjacent to the project site.

20. Much of the Project will not be visible from the surrounding streets—Silver, South, and Grandview Streets. The two multi-unit buildings are in the interior of the original lot.

21. The Project's buildings are intended to blend in with the neighborhood: the architectural style is similar to that of the area.

22. As proposed, the buildings have gabled or pitched roofs, dormers, and covered porches with a building height of 25 feet.

23. The Project lot has no historic sites or places, but the surrounding neighborhood includes historic 19th and early 20th century homes and outbuildings.

24. Silver and Grandview Streets have been listed on the State Register of Historic Places since November 19, 1997. VDHP State Historic Preservation Officer Laura V. Trieschmann Letter to District Commission Acting Chairman John S. Liccardi (Dec. 10, 2015), Applicant Ex. 24. The Bennington Downtown Historic District is listed on the National Register of Historic Places. Id.

25. The original proposal from Appleridge and Hawk's Associates was approved with curb cuts on South Street and Silver Street. The South Street curb cut was completed during the original phase of construction, and is the only access point for the existing 15-unit development on Eden Way. Shires Housing proposes to construct the Silver Street curb cut for the Project, which would provide a second access point for the Project and existing development.

26.     The Project is expected to generate an additional 15 vehicle trips during the weekday AM peak hour and 18 trips during the PM peak hour.  Creighton Manning Letter to MSK Engineering and Design 1, Applicant Ex. 18.

27.     The anticipated volume of new trips is considered low and below the 100-trip threshold for consideration of potential traffic impacts.

28.     With the addition of the Silver Street curb cut, the increase in traffic on Silver Street attributable to the Project is expected to be one additional vehicle every five to ten minutes.

29.     Because Eden Way is a narrow street with several curves, traffic is not expected to use it as a cut-through between South Street and Silver Street.

30.     The Project traffic is not expected to have a significant impact on the surrounding neighborhood.  Id. at 1-2.

31.     The minimum stopping distance for a road like Silver Street is 200 feet.

32.     The sight distance for drivers exiting Eden Way onto Silver Street is 337 feet looking south and 343 feet looking north.

33.     There are no wetlands in the Project area.

34.     The Project is not located in a floodway or in a Flood Erosion Hazard area as determined by the Agency of Natural Resources.

35.     The Project is not located in, nor does it have a potential to impact, a headwaters area.

36.     There are no streams on or adjacent to the Project.

37.     The Project site is a partially constructed development with no natural features remaining.  The site has been leveled and excavated, a roadway has been roughed in, and utilities have been installed underground.

38.     The Project site does not contain historic or cultural resources.

39.     The Project site is unlikely to yield archaeological resources.

40.     The project has the following minimum setback distances:

        a.  Front yard setback from Silver Street of 25 feet.

        b.  Side yard setback from Eden Way for duplex units of 15 feet.

        c.  Side yard setbacks for multi-units of 20 feet.

41.     The Project site is considered one lot, which fronts on Silver Street.

42. The six-unit apartment building and four of the five duplexes faces Eden Way. The fifth duplex is on the corner of Eden Way and Silver Street and faces Silver Street.

43. The eight-unit apartment building faces a parking lot, which connects to Eden Way.

44. Each duplex building has a small yard serving as open space. The amount of open space is small; however, it contributes to the overall design of the Project.

45. The open space to the east of the two multi-unit buildings is a common area that may be accessed either directly from the apartment buildings or by a gravel path for residents who live in the duplexes.

46. The Project has less overall building coverage than the original project and the first revision to the project, and therefore, there is an increase in the amount of open space. The Project's setbacks are identical to those approved in the prior two proposals.

47. As proposed, Eden Way will be lined with sidewalks and trees within the Project. The plans include 2.5-inch caliper deciduous trees lining Eden Way, and a concrete walk—or sidewalk—in front of the duplexes and apartment buildings.

48. A five-foot wide walking path made of bark chips and mulch is proposed to connect the Project's parking lot at the end of Eden Way to Grandview Street.

49. The Project is expected to generate $24,000 in property taxes annually.

50. The Project will not create an undue financial burden on the Town's fire protection, police protection, road maintenance, and solid waste disposal services.

51. Some amount of blasting may be needed to build the eight-unit building and Duplex #3.

52. The sizes of the areas that may require blasting are relatively small.

53. The eight-unit building is within approximately 105 feet of the closest single-family home, which is on Grandview Street, and within 90 feet of the closest existing duplex on Eden Way, which was constructed as part of the original project.

54. Proposed Duplex #3, located west of the proposed duplex facing Silver Street, is within 75 feet of the closest single-family home, which is also on Silver Street.

55. Blasting has the potential to result in damage to nearby properties.

56. Two neighbors' homes may have been damaged by blasting during construction of the original Appleridge condominiums. The blasting may have caused damage in the basement of one home, and cracked the plaster walls in the other.

57.    One of the conditions in the 2005 PRD and zoning permit was that Appleridge was required to give a copy of a pre-blast video of neighboring properties "to each such property owner prior to any blasting."

58.    A condition in the 2006 permit amendment required that any blasting would occur within one year after construction commenced.

59.    The current Town approval, issued in 2014, requires Shires Housing to submit a detailed blasting plan acceptable to the Town of Bennington before starting any blasting.  If the Town so requires, Shires Housing would need to pay the Town the costs incurred to retain an expert to review and approve the plan.  The plan must include pre- and post-blasting inspections, the results of which are to be filed with the Town.  Additionally, the plan must include a claims review process by a neutral third party, with the costs of the third party paid by Shires Housing.  Shires Housing must also pay for any damage due to blasting determined by the third party.  Finally, prior to commencing construction, Shires Housing must file a $1 million Letter of Credit or other surety with the Town to secure its obligations regarding blasting and its obligation to complete construction within two years.

60.    Shires Housing offered the following blasting protocol:[5]

    a. A seismic survey or blasting firm shall be employed by Shires Housing to perform and monitor the explosive work.  The firm(s) shall have a minimum of five years of experience in similar rock work, show proof of license to handle explosives, and show proof of adequate liability insurance.

    b. The seismic or blasting firm(s) shall conduct a pre-blast survey of all buildings or water supplies within 500 feet of the work area.  The survey shall include, but not necessarily be limited to, videotapes, pictures, and notes which identify the existing condition of all structures and portions thereof.  A post-blast survey, including the same review as the pre-blast survey, shall be conducted to determine the condition of all structures and portions thereof after blasting.

---

[5] Shires Housing Exhibits numbers 26 and 27 contain these procedures.

c.  All work shall conform to all applicable codes for explosive handling and use including, but not limited to, NFPA 495;[6] all local, state and federal regulations; and the procedures outlined in the "Blasters Handbook" by the Dupont Company.

d.  The company employed by Shires Housing to perform any blasting work shall follow the State of Vermont's Best Management Practices for Blasting to Avoid Environmental Contamination.

e.  The drilling and/or seismic survey firm(s) shall notify all abutting property owners and residents seven days in advance of any drilling or blasting activities.  The local police and fire departments shall be notified 24 hours in advance of any blasting.  Signs shall be posted at all entrances at least 500 feet from the work area advising of blasting and describing the warning whistle before a blast.  Drilling and blasting shall not commence until a pre-blast survey is complete.

f.  Drilling operations shall be conducted Monday through Friday 7:00 a.m. to 5:00 p.m.  Explosive detonations shall be limited to 9:00 a.m. to 4:00 p.m. Monday through Friday.

g.  The blasting and/or seismic survey firm(s) shall maintain two continuous recording seismographs on site during explosive detonation.  The seismic record shall be reviewed by an Engineer qualified to assess accelerations produced by explosive shock waves.

h.  No blasting of any kind will be conducted without appropriately sized blast mats or adequate backfill to prevent fly rock of any kind.

i.  The blasting firm shall keep daily records of hole location, depth, explosive load, weight per delay per hole, the type of subsurface materials and any unusual event during an explosive detonation.

j.  There shall be no overnight storage of explosive material on the site except in containers which conform to NFPA 495.

---

[6] NFPA 495 is a code adopted by the National Fire Protection Association that identifies reasonable levels of safety for the manufacture, transportation, storage, sale, and use of explosive materials.

k. The determination of maximum charge weight per delay shall be generally based on the formula proposed by the American Insurance Association or current regulations.

61. Pre-blast and post-blast surveys will document any change in or damage to nearby structures.

62. Radon levels in structures can change daily, weekly and seasonally due to a variety of factors.

63. Fractures in bedrock are an interconnected network of planar features in the subsurface and exact locations and intersections in the sub-surface are generally difficult to predict.

64. Radon measurements in a dwelling may vary over time and it is difficult to prove that any change in radon concentrations is due to nearby blasting.

65. Obtaining pre-blast and post-blast radon gas measurements will indicate whether additional radon gas is infiltrating into neighboring residences, but it would be difficult to attribute any change to nearby blasting given that radon levels vary over time in a dwelling. Agency of Natural Resources Response to 11/12/15 Hearing Recess Order Request, Applicant Ex. 22.

66. Controlled blasting and an adequate blasting plan and implementation from a reputable drilling and blasting company will mitigate the risks of opening fractures in bedrock off site or damaging nearby homes. Id.

67. The Act 250 permit amendment approved by the District Commission included two conditions related to blasting. First, Shires Housing must hire a trained, certified and licensed blasting and drilling contractor to provide a comprehensive blasting plan to prevent damaging nearby historic homes. Second, Shires Housing must retain an independent third party for survey, inspection, monitoring, damage assessment, and reparation.

68. The Project's proposed buildings will include radon gas collection and testing equipment with fans to control radon gas concentrations inside the building units.

69. The Act 250 permit amendment approved by the District Commission includes a condition (#14) that requires Shires Housing to use wood siding and wood trim, to be compatible with the historic architectural character of the South Street Historic District, as well as adjacent homes on Grandview and Silver Streets.

70.     Shires Housing prefers to use composite materials rather than wood for the horizontal clapboard siding and trim on the Project's multi-unit buildings and duplexes.

71.     Composite materials hold paint better and longer and are more resistant to rot than wood.

72.     The proposed composite materials are not vinyl siding, but a type of cement board.

73.     The aesthetic differences between the composite materials and wood are slight. From the sidewalk or the street, a passerby would have great difficulty in distinguishing the two materials.

74.     The initial expense of the composite materials could be higher than wood, but the maintenance costs would be lower.

75.     The Project has 46 proposed parking spaces.

## Conclusions of Law

Our review of both permits on appeal is *de novo*. 24 V.S.A. § 4472(a); 10 V.S.A. § 8504(h. In a de novo hearing before the Environmental Division, "all questions of law or fact as to which review is available shall be tried to the court, which shall apply the substantive standards that were applicable before the tribunal appealed from." V.R.E.C.P. 5(g). As with all matters heard on appeal before this Court, our review is limited to those issues raised in the Statements of Questions. V.R.E.C.P. 5(f).

Before addressing the merits of the permit applications, we begin with a threshold issue regarding the scope of our review. The parties disagree as to whether the permit applications should be reviewed as amendments to existing permits, or as new, standalone permit applications. Shires Housing argues, based on "common sense and precedent," that this Court's review of the two matters on appeal is limited to the impacts of the changes resulting from the applications to amend the permits. Shires Housing further asserts that unaffected findings may not be reopened. The Neighbors countered at trial that both permits had expired, and therefore Shires Housing's applications should be considered anew.

The parties' statements of questions do not, either expressly or by implication, raise the issue of whether any of the original permits had expired, or whether the applications before the

Court are new or amended applications. Nor were these matters raised in pretrial pleadings. We must address this question, however, because it affects the scope of our review.

When a permit applicant seeks an amendment rather than authority to develop a new project, the scope of review for both municipal and state permits, including Act 250, is often narrowed. See In re Taft Corners Assoc., Inc., 160 Vt. 583, 593 (1993) (finding that the Environmental Board[7] had no authority to reopen an umbrella Act 250 permit once it became a final permit); Village of Woodstock v. Bahramian, 160 Vt. 417, 424 (1993) (holding that in an appeal from municipal panel's denial of an application for permit amendments, parties could not challenge the underlying permit or other amendments that had been approved and had not been appealed); In re Route 103 Quarry, No. 205-10-05 Vtec, slip op. at 6 (Vt. Envtl. Ct. Nov. 22, 2007) (Durkin, J.) (explaining that the scope of criteria is narrowed when an Act 250 permit applicant requests an amendment because the pre-existing permit is not subject to attack in a subsequent proceeding). The Court may not reopen the original application to address the criteria on which the amended application has no substantial impact. Taft Corners, 160 Vt. at 592. The policy reasons for this are two-fold. First, the property owner is entitled to rely on vested rights. Route 103 Quarry, No. 205-10-05 Vtec at 6 (Nov. 22, 2006). Second, the orderly governance of development and a reasonable reliance on the process demand certainty. Taft Corners, 160 Vt. at 593. Both principals would be undermined if a party is allowed to collaterally attack a pre-existing approval through the amendment process.

Conversely, if the municipal or Act 250 approvals and the subsequent amended approvals expired, Shires Housing's application would need to run the full gauntlet of review. See 10 V.S.A. § 6091(a) ("At the expiration of each permit, it may be renewed under the same procedures herein specified for an original application."); In re Wood NOV & Permit Application, 2013 VT 40, ¶ 39, 194 Vt. 190 (finding that a permit to redevelop a commercial building had expired along with any rights under it).

The evidence before the Court supports a conclusion that the municipal and Act 250 approvals have not expired. With respect to Act 250, pursuant to 10 V.S.A. § 6090 (b)(1), permits

---

[7] The Environmental Board determined Act 250 cases prior to the establishment of the Environmental Division of the Vermont Superior Court.

are issued for an indefinite term.[8]  Condition number 7 of LUP #8B0573-1 expressly states that the approval is for an indefinite term.  Furthermore, the Court finds it persuasive that the District Commission treated Shires Housing's application as an amendment to the original Act 250 land use permit.  In its August 24, 2016 approval, the District Commission referred to the permit as "Land Use Permit Amendment #8B0573-3."[9]  Applicant Ex. 3.  In fact, the District Commission's Findings of Fact, Conclusions of Law, and Order associated with #8B0573-3 states that Act 250 jurisdiction attaches via a permit amendment.

Similarly, the evidence before the Court shows that the Town of Bennington's PRD approval has not expired.  The Town's 2006 amendment expressly states that, except as modified, the conclusions and conditions set forth in the August 16, 2005 DRB decision remain valid and in full force and effect.  In November 2014, the DRB approved the modified PRD for Shires Housing and Appleridge.  The DRB's 2014 Findings of Fact and Decision states that Shires Housing is seeking approval of an amendment to the PRD development.  The underlying application for DRB review states "Reason for Application: Amendment of Existing Planned Residential Development."

Neighbors argue that the municipal approval has expired pursuant to Regulations Article 10, Section 10.3(C)(1) which states: "[p]ermits shall remain in effect for one year from the date of issuance, unless the permit specifies otherwise.  All development authorized by the zoning permit and associated approvals shall be completed within this period, or the zoning permit shall become null and void."  While Section 10.3(C)(1) can void the zoning permit for failure to timely complete construction, it does not affect the underlying DRB approval; in this case the DRB's approval of the Development Plan and the Planned Residential Development plan approval.  Levy v. Town of St. Albans Zoning Bd. of Adjustment, 152 Vt. 139, 143–44 (1989).

The Court concludes that neither the municipal nor Act 250 approvals of the prior development plans or PRD approval have expired.  We also conclude that both the DRB and the District Commission treated the applications on appeal as amendments to prior approvals.  We agree with this approach.  Within our de novo appeal process we undertake a review of the

---

[8] Exceptions to this are permits for extraction of mineral resources, solid waste disposal facilities and logging above 2,500 feet which are issued for a specified term.

[9] The July 2006 amended permit was titled #8B0573-1.  Presumably there was also a #8B0573-2, but that amended permit was not offered into evidence.

pending applications as though we are the DRB or District Commission and we apply the same substantive standards as applied below.  V.R.E.C.P. 5(g).  Therefore, we will review the legal issues presented by the Statements of Questions with the understanding that the applications before the Court are applications to amend the previous approvals.  For each issue, organized by the parties' Statement of Questions, we conduct an abbreviated review of the permit applications as the applications seek amendments to the Act 250 and municipal approvals.   We will not disturb the conclusions of the earlier reviews which are unaffected by the amendments. For some of the questions before the Court, however, it is not apparent whether the issue is new to the amendment or whether the issue has been reviewed previously.   In these situations, we conservatively conduct a more thorough review, similar to our review of applications for new developments.

## I.    PRD Appeal

The Neighbors appeal the PRD permit amendment for the Project based on eight grounds presented in their Statement of Questions.

a. *The Project will not have an adverse impact on community facilities or services, the character of the neighborhood, or traffic.*

Question 1 of the Neighbors' Statement of Questions asks whether the Project will result in an adverse effect on the capacity of community facilities and services, the character of the neighborhood, or traffic.

Under Regulations Section 6.3(A)(1)–(3), a zoning application may be approved only if the proposed development will not result in an undue adverse effect on the capacity of existing or planned community facilities or services; character of the neighborhood or area affected; and traffic on roads and highways in the vicinity.

### 1.   Impact on Community Facilities and Services

Appleridge received municipal permits to develop 53 units at this location in 2005, and 42 units in 2006.  No evidence was presented to show a marked change in the Town's community facilities or its capacity to deliver services since that time.  Because the current proposal would bring the overall size of the Eden Way properties to 39 units—including the existing 15 units— the impact of the proposal on community facilities and services is expected to be less than

originally approved since there will be fewer residents. Based on the credible evidence admitted at trial, including information within a Municipal Impact Questionnaire and the evidence provided by the Town Manager, the Court concludes that the Project will not unduly burden the town's fire protection, police protection, road maintenance, or solid waste disposal services.

Both parties presented evidence of the Project's impact on local schools. The Neighbors argue that the local elementary school today is already at or near capacity and is an under-performing school with a majority of the children on free or reduced lunch. Neighbors contend that adding more children would cause an undue adverse effect on the Bennington School District. Shires Housing, however, provided more credible evidence from the school's superintendent. James R. Culkeen, Superintendent Southwest Vermont Supervisory Union, anticipates 10 to 12 school-aged children will live in the Eden Way units based on the proposed Project. Mr. Culkeen concludes that even if those children are concentrated in kindergarten through fifth grades and attend Bennington Elementary School, the school district can absorb them with little measurable impact. We agree with this conclusion.

The Court concludes the Project will not have an adverse impact on community facilities or services.

### 2. Impact on Character of the Neighborhood

In reviewing a municipal permit application, the Court generally uses a two-prong test to determine whether a development will have an "undue adverse effect" on the character of the neighborhood or area affected. Rublee 246 White Birch Lane CU, No. 140-11-15 Vtec, slip op. at 10 (Vt. Super. Ct. Envtl. Div. Aug. 23, 2016) (Walsh, J.). First, the Court will determine whether the proposed development is in harmony with the purpose statements in the Town's plan and bylaws. Id. Next, the Court considers whether the proposed development will have an undue adverse effect on existing development. Id. ("Looking to existing uses in addition to purpose statements . . . gives teeth to the character-of-the-area requirement, and it gives reviewing tribunals—and applicants—concrete standards to measure proposed uses against.").

The Regulations also require the two-part test. The DRB must consider the "design, location, scale and intensity of the proposed development and/or use, relative to the character of the adjoining properties . . . and . . . the proposed development's compatibility with the

purpose and character of the affected zoning district . . . the town plan, and testimony as provided as part of the public hearing process."  Regulations § 6.3 (A)(2), Applicant Ex. 29, 113.

We first consider the character of the area as defined in the Regulations and Town Plan. The Bennington Town Plan calls for the Town to:

1. Improve the existing housing stock to provide a variety of opportunities for rental and home ownership for people of all income levels.
2. Create infill housing opportunities . . . .
. . .
6. Recognize and address the housing needs of professionals relocating to the area by supporting the renovation of existing dwellings and construction of new dwellings to serve this population.
7. Recognize and address the housing needs of elderly and disabled persons with limited mobility by working with local and state housing agencies and private developers.  Support renovation of existing housing and development of new housing that meets the needs of these groups in and near the center of town.
. . .
9. Work with Shires Housing, other housing agencies, and private developers to develop an adequate supply of affordable housing and develop programs that encourage home ownership for people and families with incomes at or near the town median. . . .

Bennington Town Plan Chapt. 5.5, Applicant Ex. 28, 58–59.  We conclude that the Project advances each of the enumerated housing policies.  The Project is an infill development that was designed by Shires Housing to provide new, affordable rental housing near the center of Town.

The Town Plan also describes the Mixed Residential (MR) District, where the Project is located:

> The Mixed Residential Districts are intended to provide for compact residential development that may include one and two family dwellings as well as apartments, row houses, and similar types of housing.  Planned developments with integrated designs are encouraged to promote the most appropriate use of the land and to ensure the most efficient use of municipal services.
> . . .
> The scale, design, and orientation of new buildings in the Mixed Residential Districts shall be consistent with historic structures and development patterns in the surrounding area.  Front yards are to be attractively landscaped and should include appropriate pedestrian amenities.  Whenever possible, neighborhoods shall be linked by pathways and sidewalks.

Id. Chapt. 3.2, Applicant Ex. 28, 22.

The Regulations describe a similar purpose of the MR district and specifically call for "planned development projects with integrated design, in order to promote the most appropriate use of the land, to ensure economical provision of streets and utilities, and to secure the best possible environment for those types of dwellings." Regulations Table 3.11, Shires Ex. 29 49.

We conclude that the Project advances the purposes of the MR District. The Project comports with the Town Plan's description of the MR District, in that it is a planned development with an integrated design that provides compact residential development in duplexes and small apartment buildings. The design includes landscaped front yards as well as walking paths and sidewalks that connect the Project to the surrounding neighborhood. As an infill, in town development, the Project also promotes appropriate use of land and ensures efficient use of municipal services. The Project would complete the development of a block that is just two blocks south of downtown Bennington and within the Town's Urban Growth Area, where the Town encourages concentrated development to maintain sustainable levels of water and sewer service.

The Project is also designed to aesthetically integrate into the adjacent historic neighborhood, with an appealing street presence. The duplex closest to Silver Street orients toward that street and is architecturally similar to nearby houses. The apartment buildings are interior to the lot and mostly hidden from view of passersby on Silver Street. Considering the various aspects of the Project's design, the Court finds the Project is compatible with the purpose and character of the MR District. Therefore, as described in the Town Plan and Regulations, we conclude that the Project will not result in an undue adverse effect on the character of the neighborhood.

We next consider the character of the area as it actually exists today. The Project is on a 2.7-acre lot within a block bordered by Silver, Grandview, South and Prospect Streets. The density of the Project is about average compared with development on the rest of the block. See Applicants' Ex. 17. Silver and Grandview Streets are mostly lined with single-family Victorian homes. Silver Street also contains a triplex and two duplexes in the same block as the Project. Id. The lots on Grandview Street are small, each averaging about a quarter-acre. Id. The lots

along Silver Street are up to a half-acre or slightly larger. Id. Silver and Grandview Streets are listed in the State Register of Historic Places.

In contrast, South Street is heavily populated by multi-unit buildings, including Nathaniel Court where 42 units are clustered in four buildings on a lot smaller than the one Shires Housing plans to develop. Multiple duplexes and triplexes stretch from Grandview to Prospect Streets. The Project's two largest buildings of six and eight units are located in the interior of the block, farthest from passersby and largely blocked from view. Both buildings are two stories high, in keeping with the surrounding properties. The Project's duplexes will line Eden Way to Silver Street. The Project's architectural styles and color scheme will blend in with the neighborhood.

The Neighbors contend the Project is inconsistent with the character of the neighborhood because the residents will be renters rather than owners, the duplexes and two larger multi-unit buildings are not in keeping with the single-family homes lining Silver and Grandview Streets, and the yard sizes are too small. They also argue that the Project violates the Regulations and aesthetics of the neighborhood because either Eden Way is a driveway and only one of the Project's buildings orient toward a street as required, or Eden Way is a street and the setbacks are insufficient.

As for the Neighbors' issues of renting verses ownership, we note that the regulation of land use based solely on the identity of the owner or user of the property is not within the authority granted to a municipality under 24 V.S.A., Chapter 117. Vt. Baptist Convention v. Burlington Zoning Bd., 159 Vt. 28, 30–31 (1992) ("A distinction based upon the identity of the owner rather than the public health, safety, morals, or general welfare would be invalid.") (citation omitted). Additionally, because the Regulations do not differentiate between renters and owners, we will not analyze those aspects of the Project and any alleged impacts.[10]

In reviewing this amended Project, we find that the changes proposed will not have an undue adverse impact on the character of the area despite the Neighbors' concerns. The Project is a hybrid between the 2005 and 2006 proposals, with fewer units than either of them. It retains the multi-unit buildings that were originally proposed, but with lower heights and fewer units,

---

[10] A relevant regulation in the Town's bylaws prohibits the exclusion of "low and moderate income housing." Regulations § 4.5(5), Applicant Ex. 29 73.

and provides more housing in duplexes, as in the 2006 application. Because the Project will result in fewer housing units on Eden Way and more open space than either previous proposal, the Project will have a lighter impact overall. Compare Applicant Ex. 5, with Applicant Exs. 32 and 33. Additionally, the architectural and aesthetic features of the Project are designed to blend in with the existing neighborhood. The Project is weighted toward the interior of the block, anchored by the two multi-unit buildings, and will be less visible from the surrounding streets.

The Project is also designed to transition down from the multi-unit buildings in the interior of the block, to the duplexes as Eden Way reaches Silver Street. Where the Project touches Silver Street, one duplex will sit on the corner of Silver Street and Eden Way, where it will blend in with the neighborhood. See Applicant Ex. 9–12. The duplex has a 25-foot front yard setback in conformity with the other houses on the street, and is architecturally and aesthetically designed to fit in with the historic homes. Just two doors north on Silver Street is a triplex. Applicant Ex. 17. The rest of the Project is less visible from Silver Street, because Eden Way curves out of view just past the first duplex and the multi-unit buildings sit in the middle of the block.

If Silver and Grandview Streets were the only streets in the Project's neighborhood, the Neighbors' concerns would be considerably stronger. As it is, South and Prospect Streets also surround the Project. South Street is populated with multi-unit housing, including the 42-unit Nathaniel Court, which is adjacent to the Eden Way properties. Next door to Nathaniel Court is a three-unit building at the corner of South and Prospect Streets. We therefore conclude that the Project is consistent with the existing development in the neighborhood.

As the Neighbors correctly point out, the yards of the Project's duplexes and the multi-unit buildings are differently proportioned than those of the single-family homes in the neighborhood, and the duplexes orient toward Eden Way rather than Silver Street, with the exception of the duplex on the corner of Silver Street. The purpose of a PRD, however, is to provide flexibility to promote efficient use of land. Regulations Section 9.1(B) (when approving a PRD, "the Development Review Board may modify applicable general area and general dimensional requirements required elsewhere in these regulations"). Furthermore, it would be a poor design, and pointless, to orient the duplexes in a direction other than Eden Way, the access the residents will use to enter and leave their homes either on foot or by car. Additionally, the Project, as an amended proposal, provides the same setbacks and more green space than the

prior two iterations that were approved and not appealed. We do not find merit in the Neighbors' assessment of the Project's impact on the neighborhood and we conclude that the Project is consistent with the existing development in the neighborhood.

The Neighbors also provided testimony from a real estate professional who testified that the Project had already adversely affected the neighborhood's property values. This testimony of impact to surrounding area property values is afforded limited weight as there are many possible causes of decreased property values other than this Project.

Considering the design, location, scale and intensity of the Project, the Court finds that the Project will be among similar housing immediately adjacent to it and in the area. It is a less intense use of the land than originally approved, with less density, less height and less lot coverage than the two previous approvals. The setbacks are the same as those approved by the DRB in 2005 and 2006. As an amended Project, we conclude it is in harmony with the purpose of the MR zoning district and fits with existing development in the neighborhood and will not result in an undue adverse effect on the character of the neighborhood.

3. Impact on Traffic

The Regulations require the DRB to consider the projected impact of traffic on roads and highways in the vicinity of the proposed development, relying on accepted transportation standards. Regulations § 6.3(A)(3), Shires Ex. 29 113. The DRB should not approve a project if it "would result in the creation of unsafe conditions for pedestrians or motorists or unacceptable levels of service for local roads, highways and intersections," unless the applicant can mitigate the problems. Id.

In reviewing the traffic concerns for this amended Project, we start with the realization that fewer units generally equate to fewer vehicles. The DRB previously permitted 53 and 42 units for this location; 39 units, including the 15 existing condominium units, will have less of an impact on Bennington's roads. Also, the Project's layout is similar to the previous iterations in that Eden Way will connect to Silver Street. Residents also will be able to enter or exit on South Street, the existing access point for the 15 condominium units.

Shires Housing submitted a report from Creighton Manning Engineering which found the Project will increase weekday traffic by 15 peak hour trips in the AM and 18 in the PM peak hour.

Applicant Ex. 18. The increased traffic on Silver Street is not expected to be significant, and may result in one additional vehicle on the road every five to ten minutes. Id. Eden Way is not expected to become a cut-through street for drivers, since Grandview and Prospect Streets already provide a more direct east-west connection between Silver and South Streets. Id. Residents also may choose to walk rather than drive two blocks to downtown Bennington. Id.

The Neighbors provided little evidence addressing their concerns with traffic other than their lay opinions to suggest the Project would create unsafe conditions, particularly for pedestrians. Shires Housing's expert witness Jason M. Dolmetsch, a civil engineer, testified that the minimum stopping sight distance for a road like Silver Street is 200 feet, based on the speed limit. In other words, a driver should be able to stop within 200 feet of a safety concern, such as a pedestrian in a crosswalk. Mr. Dolmetsch further testified that there are adequate stopping sight distances for the proposed crosswalk on Silver Street, meaning that the crosswalk is visible from at least 200 feet away. The Court finds Shires Housing's evidence credible.

For drivers exiting Eden Way onto Silver Street, the sight distances are 337 feet looking south and 343 feet looking north. These sight distances are adequate for drivers exiting Eden Way, and for drivers on Silver Street who observe the exiting car.

The Court concludes that the Project will not create unsafe conditions for pedestrians or motorists, nor increase traffic significantly, and the Project will not create an unacceptable level of service.

b. *In the judgment of the Court, the Project can be used for the intended purpose without danger to public health or safety, the environment, neighboring properties, the character of the area or district in which it is located.*

Question 2 of the Neighbors' Statement of Questions asks whether the Project, as a subdivided property, will be used for its intended purposes "without danger to the public health or safety, the environment, neighboring properties, the character of the area or district in which it is located," as required by the Regulations § 8.3(A).

The Regulations cited by the Neighbors are intended to protect natural and fragile features of the landscape. Specifically, these are wetlands, floodplains and surface waters, natural areas, historic and cultural resources, and steep slopes. As set forth in the above findings of fact, none of these features are at issue in this case. The Project is on 2.7 acres of land that

was originally part of a 4.4-acre parcel intended for an approved 53-unit condominium complex in 13 buildings. The Project will not have any impact on wetlands, floodplains and surface waters, natural areas, historic and cultural resources, or steep slopes. Based upon the evidence before the Court and our above Findings of Fact, we conclude that the land can be used for its intended purposes without danger to the public health or safety, the environment, neighboring properties, the character of the area or district in which it is located.

    c. *The Project is not consistent with the setback requirements in the MR District, but as a PRD, is exempt from those requirements.*

Question 3 of the Neighbors' Statement of Questions asks whether the Project is consistent with the letter and spirit of the front, side, and rear yard setback requirements associated with the MR District. The Neighbors further ask how the setback requirements apply to a PRD.

As discussed above, Shires Housing's amended proposal does not change the setbacks approved in the prior two iterations of this Project. Additionally, the setback requirements do not rigidly apply to a PRD. The purpose of a PRD is to provide flexibility to promote efficient use of land. Regulations Section 9.1(B) (when approving a PRD, "the Development Review Board may modify applicable general area and general dimensional requirements required elsewhere in these regulations . . . ").

The project has the following minimum setback distances: front yard setback from Silver Street of 25 feet, side yard setback from Eden Way for duplex units of 15 feet, and side yard setbacks for multi-units of 20 feet. Normally in the MR District, residential buildings are required to meet a 35-foot rear yard setback for single-family homes and duplexes, and a 40-foot rear yard setback for multi-family dwellings. Side yard setbacks are 10 feet for single-family homes and 15 feet for duplexes. The front yard setback must be within 5 feet, greater or lesser, of the average front setback of historic residential structures located on the street. PRDs are an exception to these requirements. As explained in Article 4 of the Regulations, "[n]o lot, yard, court, or any other open space shall be reduced in area, so that it cannot conform to minimum dimensional or coverage requirements prescribed in these regulations, *except as approved by the Development Review Board for planned residential and planned unit developments.*" Regulations § 4.8,

Applicant, Ex. 29, 74 (emphasis added). The Project meets the requirements under the Regulations for a PRD. See Regulations Article 9. The hallmark of a PRD is flexibility in developing a lot without the restrictions imposed on single-building developments, in part to "encourage creative design and layout of development and an efficient use of land." Regulations § 9.1(A)(6).

As a PRD, the Project is a type of development encouraged in the MR district to increase density, cluster development, accommodate new development, provide opportunities for a diversity of housing types, allow for compact and village-scaled mixed-use developments, and encourage creative design and layout of development and efficient use of land. Regulations § 9.1. We conclude that the Project, as a PRD, is consistent with the letter and spirit of the front, side, and rear yard setback requirements associated with the MR District.

### d. *The Project meets the minimum requirements for a PRD.*

Question 4 of the Neighbors' Statement of Questions asks whether the Project meets the minimum requirements for a PRD. Specifically, the Neighbors ask if the Project complies with the Regulations such that building envelopes front upon and are oriented toward roads or common areas; the roads and driveways are laid out in a manner that reflects village-scale street design characterized by narrow travel lanes and a well-defined streetscape comprised of street trees, sidewalks and/or a consistent building setback; and adequate provision has been made for open space and common areas which should serve as a central organizing feature within the PRD, such as a green or a park. See Regulations § 9.3(E)(1)–(3).

Because the earlier versions of the Eden Way community were approved as PRDs, we first consider whether the Project presents a material change that requires scrutiny. We find it does not. The Project is in keeping with those prior plans, and with the 15-unit condominium community built by Appleridge. The Project's buildings are primarily oriented toward Eden Way. The eight-unit apartment building is oriented toward the parking lot, which is situated where Eden Way dead ends, and the duplex on Silver Street is oriented toward Silver Street. This is no different than the orientation of the buildings permitted in 2005. It is somewhat different than the 2006 permit, in that the 2006 permit envisioned only duplexes and did not include a large parking lot, but did include a series of smaller parking areas next to the duplexes.

The site plans are either identical or similar in other ways as well, including street trees, sidewalks, travel lanes, and building setbacks. Compare Applicant Ex. 5 with Ex. 32 and Ex. 33. The Project provides more open space then previously permitted. The 2006 permit provided for 21 separate duplexes, with one of the duplexes located in what is now the open space. The 2005 permit provided for 13 buildings, including one large 10-unit apartment building that would have filled much of the open space. Furthermore, as described in the Findings of Fact, the Project's features meet the minimum requirements of a PRD, as described below.

1. The buildings front upon and orient toward roads or common areas, and the building setbacks are consistent.

The Neighbors claim the buildings in the Project either violate the Regulations because they are not appropriately oriented to the street, or they violate the rear yard setbacks. Their faulty argument hinges on an irrelevant issue: whether Eden Way is considered a street or a driveway. If it is a street, they argue, then the buildings should orient toward it as they do, but then must meet the required setbacks. If Eden Way is a driveway, then the buildings should orient toward Silver Street. The Neighbors misapply the Regulations.

As explained above, a PRD is not required to meet minimum setback standards. The DRB—or, on appeal, this Court—can modify general area and dimensional requirements. Regulations § 9.1(B), Applicant Ex. 29, 143. In this case, Shires Housing, and Appleridge before it, complied with the setbacks by treating the Project as one lot. From the one-lot perspective, the Project fronts on Silver Street. Shires Housing then applied the front and side yard setbacks. The yards on the south and north sides of the duplexes along Eden Way are considered the Project's side yards. Given that orientation, the Project consistently meets the minimum 15-foot side yard setback for its duplexes and multi-unit buildings and in that way is no different from the projects permitted for the site in 2005 and 2006. See Regulations Table 3.11, Applicant Ex. 29, 49; see also Shires Ex. 5 (site plan showing the consistent 15-foot side yard setback for the duplexes on the south side of the property; and a consistent 17-foot side yard setback for the duplexes on the north side), Exs. 32 and 33 (showing the approved 2005 and 2006 site plans). This unconventional development is permissible for a PRD.

The Neighbors also contend the multi-unit buildings orient toward the parking lot in violation of Regulations Table 3.11. The Regulations state that multi-family structures "may orient toward the street and internal parking lots and/or courts." Regulations Table 3.11 (E)(4)(c). In this case, the six-unit apartment building, like the duplexes, orients toward Eden Way. Eden Way then continues, ending in a parking lot in front of the eight-unit apartment building. The Project complies with the Regulations as there is no other street for the larger apartment building to orient toward, and it orients toward the parking lot as required. We therefore conclude that the Project's building orientations comply with the regulations.

2. Eden Way is laid out in a manner that reflects a village-scale street design characterized by narrow travel lanes and a well-defined streetscape comprised of street trees, sidewalks and/or a consistent building setback.

Shires Housing's site plan and photographic illustrations depict an attractive, well-integrated community knit together along a narrow travel lane—Eden Way. See Shires Ex. 5–14. The street is lined with sidewalks and trees, and a walking path connects the parking lot at the end of Eden Way to Grandview Street. Id. The Project seamlessly connects to the existing condominiums.

To be considered a "well-defined streetscape," the Regulations require either street trees, sidewalks, and/or consistent building setbacks. See Regulations § 9.3(E)(2). The Project includes all three features. As previously described, the Project includes consistent building setbacks of 17 feet on the north side and 15 feet on the south side of Eden Way, behind the duplexes, and 15 feet behind the apartment buildings. Applicant Ex. 5. The plans also include 2.5-inch caliper deciduous trees lining Eden Way, and a concrete walk—or sidewalk—in front of the duplexes and apartment buildings. Id. We conclude that the Project reflects a village-scale street design because it is characterized by a narrow travel lane, and the well-defined streetscape includes street trees, sidewalks, and consistent building setbacks.

3. The Project provides sufficient open space and common areas to serve as a central organizing feature.

The Regulations require that "[a]dequate provision for open space and common areas shall be included in the design of the PRD which should serve as a central organizing feature with the PRD, such as a green or park." Regulations § 9.3(E)(3).[11]

While the Project's open space is not in the geographical center of the development, it nevertheless serves as a "central organizing feature." The open space to the east of the two multi-unit buildings is a large common area that may be accessed either directly from the apartment buildings or a gravel path for residents who live in the duplexes. Based on the evidence before the Court and our above findings of fact, the Court concludes that the Project makes adequate provision for open space and common areas serving as central organizing features within the PRD.

We conclude that the Project complies with the Town's PRD regulations. The DRB approved the earlier plans as PRDs, concluding that they complied with the Regulations. The Court finds no reason to disturb those unaffected conclusions. Based on our additional conclusions today, the Project complies with the Regulations as building envelopes front upon and are oriented toward roads or common areas; the roads and driveways are laid out in a manner that reflects village-scale street design characterized by narrow travel lanes and a well-defined streetscape comprised of street trees, sidewalks and/or a consistent building setback; and adequate provision has been made for open space and common areas which should serve as a central organizing feature within the PRD.

e. *The Project will not create an undue burden on municipal facilities or create an unreasonable demand for public services.*

Question 5 of the Neighbors' Statement of Questions asks whether the anticipated tax returns from the Project will equal or exceed the cost of anticipated municipal services and facilities directly attributable to the Project.

---

[11] The Neighbors contend the open space behind the two multi-unit apartment buildings is not big enough to site a baseball field. The Court is unaware of any requirement in the Regulations for PRDs that require such.

When a property is subdivided, as here, the DRB is required to consider whether the subdivision will "create an undue burden on municipal facilities or create an unreasonable demand for public services." Regulations § 8.6(A). To make that determination, the DRB considers whether the anticipated tax return from the proposed development is equal to or exceeds the anticipated municipal costs associated with the subdivision, and whether the subdivision will unduly burden the local government services. Id.

In reviewing the Project's application as an amendment to an existing municipal approval, the only two relevant changes the Court need consider are that 1) the Project will provide rental apartments rather than owner occupied condominiums; and 2) the Project will likely house fewer people than the 2006 permit would have allowed—and certainly less than the 2005 permit would have allowed—which may decrease the impact of the use of municipal services.

The limited evidence before the Court shows that the Project will not unduly burden the schools or any other municipal service or facility. See *supra* Part I. a(1). Shires Housing offered evidence that the Project will generate $24,000 in property taxes annually and that this amount is equal to or exceeds the anticipated municipal costs associated with the subdivision, and that the subdivision will not unduly burden the local government services. The Court therefore concludes that the Project's anticipated tax returns will equal or exceed the cost of municipal services and will not create an undue burden on municipal facilities or create an unreasonable demand for public services.

f. *The Court will not require Shires Housing to provide a fiscal impact analysis of the Project.*

Question 6 of the Neighbors' Statement of Questions asks what the financial impact of the Project will be on the Town of Bennington. The Regulations allow the DRB discretion to require a subdivision developer to provide a fiscal impact analysis of the development. Regulations § 8.6(A). The DRB may also require a developer to phase the development to accord with the Town of Bennington's capital budget and program.

Neither side presented evidence relevant to this question. The Court can find no reason, based on the evidence before it, to require Shires Housing to either provide a fiscal impact analysis of the Project or to phase-in the development.

g. *Risks related to blasting and radon must be mitigated.*

Question 7 of the Neighbors' Statement of Questions raises several concerns. The Question states that the DRB in its decision of November 4, 2014 found that "Blasting has the potential to result in damage to nearby homes." Question 7 then asks a series of questions including: Won't jack hammering potentially cause similar damage? Shouldn't the DRB have provided for potential damage to people? How will the damages be measured? Who will bear the cost? Why shouldn't the developer provide a bond to cover damages to property and persons? How will the developer measure personal injury due to radon and how will the potentially long tail of this liability be maintained to measure results?

Question 7 does not cite or refer in any way to the Regulations. The DRB's decision below does not cite any regulations governing these concerns. Furthermore, the testimony of all parties does not point to specific or general provisions within the Regulations concerning these issues.

Shires Housing's witness, Mr. Dolmetsch, testified that the Town regulates blasting through its building permits that are reviewed and issued under its Building Code, which he said references the Vermont Fire and Building Safety Code that in turn requires adherence to NFPA 495. A building permit is not before the Court and the Building Code was not offered into evidence.[12] According to Mr. Dolmetsch's testimony, the Code requires pre- and post-blast surveys, which are performed using photos, videos, and measurements of all structures within a minimum of 500 feet from the blast site with the actual distance determined by the magnitude of the blast. The Code also requires the blasting company to monitor the area during blasting and to carry liability insurance.

The Court reviewed the Regulations trying to understand how the Question 7 issues might be regulated. The only potential Regulation governing issues of blasting and jack hammering is Section 4.11 Performance Standards. Pursuant to Section 4.11, all uses in all districts shall comply with ten enumerated criteria. Only criteria 4 and 5 might potentially apply to blasting and jack hammering and radon concerns. Criterion 4 requires that no use shall emit any noxious gases which endanger the health, comfort, safety or welfare of any person, or which cause injury or

---

[12] Mr. Dolmetsch testified further that the Town's Building Code incorporates the 2012 Vermont Fire, Building and Safety Code and the National Fire Protection Act. Neither of these regulatory documents were offered into evidence.

damage to property, businesses, animal or vegetation. Criterion 5 requires that no use shall cause a vibration which, when transmitted through structures or ground, is discernable at the property line without the aid of instruments.

Taking a liberal view of Section 4.11, especially subsections 4 and 5, the regulations might be broad enough to regulate blasting. We therefore consider the potential for blasting to physically impact neighboring properties and the potential blasting impact on radon gas exposure.

In response to the DRB finding that "[b]lasting has the potential to result in damage to nearby properties," the DRB imposed a condition—Condition 7—that requires Shires Housing to submit a detailed blasting plan to the Town of Bennington if blasting is required. The plan must be approved by the Town before blasting is allowed. Condition 7 also requires that the plan include pre-blasting and post-blasting inspections, with the results filed with the Town; a claims review process by a neutral third party, paid for by the applicant; and prompt payment by the applicant to any claimant for the amount necessary to repair damage as determined by the third party. Shires Housing challenges the validity of Condition 7.

In approving a permit application, a municipal panel, and this Court on appeal, "may attach additional reasonable conditions and safeguards as it deems necessary to implement the purposes of [Vermont's municipal and regional land use statutes] and the pertinent bylaws and the municipal plan then in effect." 24 V.S.A. § 4464(b)(2). Permissible conditions include those with prospective application that alleviate adverse impacts caused by a project. 2 Am. Law. Zoning § 14:17 (5th ed.) Conditioning a permit on future approval of future submissions—as Condition 7 would do here—constitutes a prohibited condition subsequent. Statutory due process set forth in 24 V.S.A. § 4464 requires notice and opportunity to be heard.[13] Condition 7 requires Shires Housing to file a blasting plan with the Town for approval without notice to and opportunity to be heard for other interested parties in violation of due process protections.[14] We therefore VOID Condition 7 for this infirmity.

---

[13] Due process rights are set by the Vermont statute as a balance to the interests of developers and the environmental interests of adjoining landowners and localities since there is no "liberty" or "property" interest involved that is protected by the Fourteenth Amendment. See In re Great Waters of America, Inc., 140 Vt. 105, 108—10 (1981).

[14] There is an analogous prohibition against conditions subsequent within the Act 250 process. See Re: Sherman Hollow, Inc., No. 4C0422-5-EB, Revised Decision, at 9 (Vt. Envtl. Bd. Feb. 17, 1989) (where un-submitted

As part of our *de novo* review, we consider blasting impacts. Based on our above findings of fact, there is the potential for blasting to physically impact neighboring properties. Impacts could include fractures to foundations or basements and walls. To reduce the potential of these impacts occurring and to document whether in fact there are impacts, Shires Housing offers specific blasting protocol as set forth in the above Finding of Fact number 60.

With respect to radon issues, ANR completed a review of blasting concerns and whether blasting could cause changes in radon gas infiltrating into neighboring homes. Radon levels in structures can change daily, weekly and seasonally due to a variety of factors. Fractures in bedrock are an interconnected network of planar features in the subsurface and exact locations and intersections in the sub-surface are generally difficult to predict. Thus, radon measurements in a dwelling may vary over time and it is difficult to prove that any change in radon concentrations is due to nearby blasting. Based on ANR's credible evidence, we conclude that requiring radon monitoring as part of the pre- and post-survey efforts is not warranted. ANR further concluded (and the Court finds) that controlled blasting and an adequate blasting plan and implementation from a reputable drilling and blasting company will provide adequate protection for nearby homeowners.

To mitigate potential impact on neighboring structures from blasting, the Court imposes as a condition the blasting protocol set forth in Finding of Fact number 60 as necessary conditions of approval. Monitoring of radon is not included as part of this condition. The Court imposes the additional requirement of providing copies of both the pre- and post-blast surveys to property owners and the Town.

The Neighbors' Question 7 also asks "won't jack hammering potentially cause similar damage?" The Court has limited evidence relating to this issue. Shires Housing offered into evidence a December 10, 2015 letter from the Vermont Division of Historic Preservation (DHP). In this letter, DHP states that blasting and/or heavy vibrational activity may impact historic resources in the area. We address the concerns of blasting above. It is not clear to the Court

_____

information might make a difference in the denial or approval of a permit, it would contradict the purpose of Act 250 to issue a conditional permit which would retain jurisdiction over a phased project with conditions requiring certain information to be provided at a later date); see also, Re: Paul E. Blair Family, No. 4C0388-EB, Mem. of Decision, at 6 (Vt. Envtl. Bd. June 16, 1980) ("Neither the Commission nor the Board is authorized to grant a permit on the 'condition' that the criteria of the Act be satisfied at some unspecified future time.").

that jack hammering is "heavy vibrational activity."  VHP did not participate at trial and the Court could not therefore ask VHP any questions. No other party provided testimony or evidence to assist the Court on the jack hammering issue.  Lastly, the District commission did not address jack hammering within its Findings of Fact, Conclusions of Law, and Order.  We therefore are without sufficient evidence to support a conclusion that jack hammering will cause damage.

We do not consider the Neighbors' questions of potential damage to people (including a personal injury claim based on exposure to radon gas), how to measure such, who should bear the cost, and the need for the developer provide a bond to cover damages to property and persons as we have no evidence supporting the Town's authority to regulate these issues nor that the Regulations speak to these issues.  Furthermore, the Environmental Division is a Court of limited jurisdiction.  See 4 V.S.A. § 34 (defining the Court's jurisdiction under state laws); 10 V.S.A. § 8504(h) and V.R.E.C.P. 5(g) (the Environmental Division applies the substantive standards that were applicable before the tribunal appealed from).  Although this Court must ensure compliance with applicable regulations, we do not have jurisdiction to adjudicate private property rights.  See, e.g., In re Britting Wastewater/Water Supply Permit, No. 259-11-07 Vtec, slip op. at 4 (Vt. Envtl. Ct. Apr. 7, 2008) (Wright, J.) ("This Court's consideration of property-related issues and rights is limited to issues within the scope of the regulations governing the permit application.").  Private property rights, and for that matter, damages to persons, are outside of our jurisdiction. LeGrand & Scata Variance Application, No. 110-8-14 Vtec, slip op. at 4 (Vt. Super. Ct. Envtl. Div. Nov. 12, 2015) (Durkin, J.) (explaining that the only proper forum for resolving property disputes is the Civil Division of the Superior Court).

h.  *The site design does not lack continuity and does not create a dysfunctional layout.*

Question 8 of the Neighbors' Statement of Questions asks whether the Project lacks continuity and creates a dysfunctional layout because rental apartments will be in close proximity with owner-occupied units.  The Regulations do not differentiate between renter-occupied and owner-occupied housing.

Furthermore, as expressed above, the regulation of land use based solely on the identity of the owner or user of the property is not within the authority granted to a municipality under 24 V.S.A., Chapter 117. Vt. Baptist Convention, 159 Vt. at 30–31.  A relevant regulation in the

Town's bylaws prohibits the exclusion of "low and moderate income housing." Regulations § 4.5(5), Applicant Ex. 29 73. Because the Regulations do not differentiate between renters and owners, we conclude that whether a unit is renter or owner occupied does not result in a dysfunctional layout.

As to the other questions raised in Question 8, such as whether it is "OK" that the DRB did not conduct a site visit to the Project, we note that our review of the applications is *de novo*. When undertaking *de novo* review, "this Court does not consider any previous decisions or the proceedings below; rather, we review the application anew as to the specific issues raised in the statement of questions." In re North East Materials Group, LLC, No. 143-10-12 Vtec slip op. at 4 (Vt. Super. Ct. Envtl. Div. May 9, 2013) (Walsh, J.) (quoting In re Whiteyville Props. LLC, No. 179-12-11 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. Dec. 13, 2012) (Durkin, J.) (internal quotations omitted). Whether a lower adjudicative body conducted a site visit is irrelevant to our review. This type of alleged error by the DRB below is cured by our *de novo* hearing in this Court. See In re JLD Props. of St. Albans, LLC, 2011 VT 87, ¶ 12, 190 Vt. 259. The Court completed a site visit.

Lastly, the neighbors in Question 8 ask whether other reasonable alternatives exist for affordable housing. The neighbors offer no evidence that the Regulations require consideration of reasonable alternative locations for the siting of the Project. This Court's consideration is limited to issues within the scope of the regulations governing the permit application. See, e.g., In re Britting Wastewater/Water Supply Permit, No. 259-11-07 Vtec, slip op. at 4 (Vt. Envtl. Ct. Apr. 7, 2008) (Wright, J.). The Court concludes such review is beyond our jurisdiction.

## II. The Neighbors' Act 250 Permit Appeal

The Neighbors and Shires Housing both appeal the Act 250 Permit. The Neighbors' Statement of Questions contains 12 questions; Shires Housing includes three. As with the PRD and zoning permit appeal, the Court will analyze the Act 250 permit application as an amendment application. We begin with the Neighbors' concerns.

### a. *The Project will not result in undue air pollution.*

Before granting an Act 250 permit, we must find that the development will not result in undue air pollution. 10 V.S.A. § 6086(a)(1). As with most Act 250 criteria, the applicant bears the burden of proof. 10 V.S.A. § 6088(a).

Act 250 Criterion 1 requires applicants to show that their project will not cause "undue water or air pollution." 10 V.S.A. §6086(a)(1). Whether pollution is "undue" is highly fact-specific; it depends on "the nature and amount of the pollution, the character of the surrounding area, whether the pollutant complies with certain standards or recommended levels, and whether effective measures will be taken to mitigate the pollution." Id.

Questions 1 and 2 of the Neighbors' Statement of Questions ask whether the Project will cause an undue adverse effect on air quality in the surrounding neighborhood as a result of blasting or the byproducts of blasting, given the proximity of the homes and the fact the homes and the Project are located on the same rock ledge. Specifically, the Neighbors are concerned about the release of radon through fissures in the rock caused by the blasting.

Blasting in the area of the Project could fracture the local bedrock and create a new pathway for radon migration into area structures. As such, the Project's blasting could cause undue air pollution. Based upon ANR's credible evidence, however, controlled blasting and an adequate blasting plan and implementation from a reputable drilling and blasting company will mitigate the opening of fractures in bedrock off site or in damage to adjacent homes. Applicant Ex. 22. As discussed above in Part I. g., the Court sets conditions of approval by imposing a blasting protocol. We apply these conditions in this Act 250 matter as well to address this concern. With the added conditions, the Court concludes that the Project will not result in undue air pollution and with these conditions we conclude that the Project complies with Criterion 1.

b. *The Project will not cause unreasonable congestion or unsafe conditions with respect to the use of the highways and other means of transportation.*

Before issuing an Act 250 permit, we must find that a development will "not cause unreasonable congestion or unsafe conditions with respect to the use of the highways . . . and other means of transportation existing or proposed." 10 V.S.A. § 6086(a)(5)(A). If the applicant produces sufficient evidence to enable the Court to make a positive finding on this criterion, then the opponent carries the burden of proving that a project does not conform to Criterion 5. 10 V.S.A. § 6088(b); see Hinesburg Hannaford Act 250 Permit, No. 113-8-14 Vtec, slip op. at 40 (Vt. Super. Ct. Envtl. Div. July 7, 2016) (Walsh, J.).

Question 3 of the Neighbors' Statement of Questions asks whether the Project would cause unreasonable congestion or unsafe traffic conditions as the proposed transportation plan provides only for "minimally acceptable site distances." The Neighbors' Question 4 asks whether the Project will create unsafe traffic conditions and endanger area children and other residents who would cross at the proposed crosswalk on Silver Street. We consider Questions 3 and 4 raising the aspect of compliance with Criterion 5.

At the outset, in reviewing the application as an amendment, the Court concludes any traffic impact will be less than what was anticipated and approved in the 2005 and 2006 permits, based on the relative number of units in each proposal.[15]

In further reviewing Criterion 5, Shires Housing submitted a report from Creighton Manning Engineering which found the Project will increase weekday traffic by 15 peak hour trips in the AM and 18 in the PM peak hour. Applicant Ex. 18. The increased traffic on Silver Street is not expected to be significant, and may result in one additional vehicle on the road every five to ten minutes. Id. Eden Way is not expected to become a cut-through street for drivers, since Grandview and Prospect Streets already provide a more direct east-west connection between Silver and South Streets. Id. Residents also may choose to walk rather than drive two blocks to downtown Bennington. Id.

As described *supra* Part I. a(3), the minimum stopping distance for a road like Silver Street is 200 feet, there are adequate stopping distances for the proposed crosswalk on Silver Street, and the sight distances are adequate for drivers exiting Eden Way onto Silver Street.

David Frederickson, one of the Appellants, testified that he is concerned about the proposed crosswalk on Silver Street because he says children blatantly walk across the street assuming they are safe rather than looking both ways. He asserted that it is especially dangerous in the winter because cars coming uphill when there is snow and ice on Silver Street try to get a good head of steam and may have trouble stopping.

Shires Housing presented expert testimony that the sight distances for motorists at Eden Way and Silver Street were adequate, including the Silver Street crosswalk. The Court finds the evidence submitted by Shires Housing is credible and sufficient to enable the Court to make a

---

[15] See *supra* Part I. a(3). for further discussion.

positive finding. The Neighbors' lay opinion does not rebut this evidence. Based on our Findings of Fact and Shires Housing's credible evidence, we conclude that the Project will not create unsafe traffic conditions and endanger area children and other residents who would cross at the proposed crosswalk on Silver Street, nor create unsafe conditions for motorists in the area, nor increase traffic significantly. Additionally, the Project will not create an unacceptable level of service.

In a related question, Neighbor's Question 5 asks whether the proposed development would cause unsafe traffic conditions and fail to protect area children and other residents who may cross at locations other than the proposed crosswalk at Silver Street. The Neighbors did not provide evidence of a specific area of concern relating to pedestrian crossing Silver Street outside of the crosswalk. When reviewing an application for land use development and considering potential safety issues, the Court must presume that pedestrians will obey the law. Doing otherwise could create endless review. Here, Shire's Housing proposes an appropriate crosswalk, and as we conclude immediately above, the Project will not create unsafe traffic conditions that endanger area children and other residents who would cross at the proposed crosswalk on Silver Street.

We therefore conclude that the Project complies with Criterion 5; 10 V.S.A. § 6085(a)(5).

c. *The Project will not have an undue adverse impact on education.*

Before issuing an Act 250 permit, the District Commission must find that the development "[w]ill not cause an unreasonable burden on the ability of a municipality to provide educational services." 10 V.S.A. § 6086(a)(6).

Neighbors Question 6 asks whether the proposed development would have an undue adverse impact on education with the addition of a significant number of students to the neighborhood schools. As explained above, both parties presented evidence of the Project's impact on local schools. In considering this Act 250 permit application as an amendment, the evidence is that the Project's impact will be lighter than in the prior two proposals. With 39 units on Eden Way, instead of the 53 originally proposed, it is likely that fewer children will live there and the impact on the schools is therefore likely to be less. We turn to the testimony presented concerning the current amendment, which was described above in Part I. a(1). The Neighbors

contend that adding more children will cause an undue adverse effect on the Bennington School District because the local elementary school underperforms and is already at or near capacity. Shires Housing offered the schools' superintendent Mr. Culkeen, who testified that the school district can absorb the additional children from the proposed Project with little measurable impact. We find Shires Housing's evidence credible, and conclude that the Project will not cause an unreasonable burden on the ability of the municipality to provide educational services and therefore complies with 10 V.S.A. § 6086(a)(6).

d. *The Project's multi-unit apartment buildings will not have an undue adverse effect on the neighborhood's aesthetics or historic sites.*

Before issuing an Act 250 permit, we must find that a development "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites, or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8)(A). If the applicant satisfies the initial burden of production, then the opponent carries the ultimate burden of proving that a project does not conform to Criterion 8. Hinesburg Hannaford, No. 113-8-14 Vtec at 54 (July 7, 2016).

Question 7 of the Neighbor's Statement of Questions asks whether the Project's multi-unit apartment buildings would be out of scale with, and cause an undue adverse effect upon, the aesthetic and historic nature of the surrounding neighborhoods, which contain many 19th century and early 20th century homes.[16] The Court understands this question to limit our scope of review under Criterion 8 to the Project's impact on the aesthetics of the neighborhood and the historic homes on Silver and Grandview Streets.

In reviewing Shires Housing's application as an amendment, we find that the changes in this iteration of the development compared with the originally permitted proposal serve to reduce aesthetic impacts on the neighborhood. The original proposal called for an apartment building with more units—10 instead of 8—and more stories—3 instead of 2. While the 2006 proposal called for only duplexes, less green space would have been available. The Project is a

---

[16] This question is similar to the "character of the neighborhood" question posed by the Neighbors in their municipal permit appeal, and discussed *supra* Part I. a(2).

hybrid between the 2005 and 2006 proposals and is well in line with those previously permitted proposals.

In further reviewing the application under Criterion 8, the Court first considers whether the Project will have an adverse effect. In judging the impact of a proposed project, the essential question is, "will the proposed project be in harmony with its surroundings—will it 'fit' the context within which it will be located?" Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985). Among the factors to consider in answering this question are present land use, architectural compatibility, the visibility of the project, and impact on open space. Id.

Since a general analysis of aesthetic impacts can be subjective, the Environmental Board established the two-part "Queechee test" to evaluate a project under Criterion 8. Id. at 17 (quoting Re: Brattleboro Chalet Motor Lodge, Inc., No. 4C0581-EB, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. Oct. 17, 1984)); In re Goddard College Act 250 and CU, Nos. 175-12-11 Vtec and 173-12-12 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Jan. 6, 2014) (Walsh, J.). First, we examine whether a proposed project may cause an adverse impact on the character of the area. Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 17 (Nov. 4, 1985). If so, the Court then determines whether that impact will be "undue." Id. The Vermont Supreme Court has approved the use of the Quechee test and we therefore employ it here. In re Rinkers, Inc., 2011 VT 78, ¶ 9, 190 Vt. 567.

1. The Project will have an adverse impact on the neighborhood's aesthetics and nearby historic homes.

The Neighbors contend the Project alters the character of the neighborhood because it stands out in contrast to the primarily single family residential neighborhood of Grandview and Silver Streets. They claim the view from Silver Street will be of duplexes and the tops of the two multi-unit apartment buildings, which is out of keeping with the streetscape along Silver Street. Because of their historic 19th and early 20th century homes, both Silver and Grandview Street are listed in the State Register of Historic Places.

The Vermont Division for Historic Preservation (VDHP), which is within the Agency of Commerce and Community Development, determined the proposed Project will have an indirect

adverse effect on the neighborhood based on its appearance. VDHP State Historic Preservation Officer Laura V. Trieschmann Letter to District #8 Environmental Commission Acting Chairman John S. Liccardi (Dec. 10, 2015), Applicant Ex. 24. VDHP found the Project "will have a strong visual presence, and become a significant non-contributing feature within the historic district and amongst the other historic houses in the adjacent neighborhood." Id. We agree with this analysis and also conclude that the Project is out of scale with surrounding homes—and the historic district along Silver and Grandview Streets—but we also conclude that the Project fits the context of South Street.

Unlike 42-unit Nathaniel Court, which is accessed only by South Street, the Project comes into direct contact with the historic homes on Silver Street via Eden Way. One of the Project's five duplexes will sit on the corner of Silver Street and Eden Way, facing Silver Street. From Silver Street, while much of the Project will not be visible, a pedestrian or motorist may be able to look up Eden Way into the interior of the block and perhaps see one or two other duplexes, and the roofs of the two-story, multi-unit apartment buildings. Each apartment building will be 25 feet high with pitched roofs and a mostly white or cream-colored exterior with some rust and gold coloring. While the architectural design and paint scheme is intended to blend in with the neighborhood, the "fit" is not perfect. A casual observer will be able to see the difference between the Project, built along a narrow street, and the historic homes along Silver and Grandview Streets. Based on the evidence, the Court finds that the Project will have an adverse effect on the aesthetics of the neighborhood and the historic district.

2. The Project's adverse impact on the character of the area is not undue.

The Supreme Court has found that a development will have an undue adverse effect on aesthetics if: "(1) it violates a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; or (2) it offends the sensibilities of the average person; or (3) the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." In re UPC Vermont Wind, LLC, 2009 VT 19, ¶ 24, 185 Vt. 296 (citing In re Times & Seasons, LLC, 2008 VT 7, ¶ 8, 183 Vt. 336).

The Neighbors claim the Project will have an undue adverse effect on aesthetics because it violates the clear written community standards in the Regulations; is "offensive and shocking" to the average person; and Shires Housing did not take steps to mitigate the appearance of the Project to bring it more in line with the surrounding historic neighborhood. We disagree.

We conclude that there is no clear written community standard intended to preserve the aesthetics of the Project's neighborhood beyond the general goals in the Town Plan and Performance Standards in the Regulations, which the Project satisfies as previously discussed, *supra* Part I. a(2). The Neighbors contend the Project violates Regulation § 6.3(B)(1) which provides, in part:

> Conditions may be imposed with regard to siting, density, setbacks, height, massing, materials and/or orientation, to ensure the following:
> a. Buildings, and modifications to existing buildings, are designed in a manner that is compatible with, and does not stand in contrast to, nearby historic structures (and other existing structures, if applicable) with regard to building scale, massing, materials, orientation and rhythm of openings (fenestration).

The Neighbors offer that this section requires that the project be compatible with the setting and context of the neighborhood; meaning that the Project buildings not stand in contrast to nearby historic structures with regard to scale, orientation and rhythm of openings. We conclude this language to be too broad to effectively apply as a clear standard for aesthetics. An example of a specific standard is requiring parking lots to be located behind buildings or requiring a minimum number of trees or shrubs based on square footage of project buildings.

The neighbors also offer the PRD requirements in § 9.3 of the Regulations as a clear community standard. Specifically, Neighbors assert that pursuant to § 9.3, a PRD must be an "effective and unified treatment of the development possibilities of the site." We again conclude that this language is too broad to effectively apply as a clear standard for aesthetics. We conclude that §§ 6.3(B)(1) and 9.3 do not set clear community standards for aesthetics.

The next issue is whether the Project is "offensive and shocking" to the average person. The Neighbors offer that the Project is both offensive and shocking because a person passing by Eden Way on Silver Street would expect to see another single-family home instead of an "unnaturally small street with rows of duplexes."

The standard we use to determine whether a Project's impacts would be shocking or offense is whether they would shock and offend an average person, not an individual Appellant. Goddard College, Nos. 175-12-11 Vtec and 173-12-12 Vtec at 14 (Jan. 6, 2014) (finding that a woodchip heating system on a rural college campus is similar in scale, material and form to existing structures and the views from a state highway and surrounding residences would not shock or offend the sensibilities of the average person).

In this case, the Neighbors exaggerate the Project's impact. The Project has only five duplexes along one street, with two on the north side and three on the south side. The average passerby will see a duplex facing Silver Street at the corner of Eden Way. The duplex will blend in with the architectural style and colors of the historic homes. Just two doors north is a triplex on the same side of Silver Street. Next to the duplex will be the entrance to the Project and another duplex set further into the block, across the street and facing Eden Way. While Eden Way is narrower than Silver Street, the Regulations encourage "narrow travel lanes" for PRDs to reflect a village-scale street design. See Regulations § 9.3(E)(2); see also discussion *supra* Part I. d. Eden Way curves as it winds back into the Project, blocking most of the Project from view. If the passerby looks up, above the treetops, he or she may also see the tops of the multi-unit buildings in the interior of the block. The individual is just as likely to see the tops of the existing duplexes.

Based on the evidence provided by both the Neighbors and Shires Housing, the Court does not find a single feature of the Project, taken individually or together, that rises to the level of "shocking" or "offensive" to an average person's sensibilities.

The final issue is whether Shires Housing did enough to mitigate the negative aesthetic impact of the Project. The Neighbors argue that Shires Housing could have built just one home on Silver Street to make it look like the other houses, with the apartment buildings behind it. The test, however, is not whether the applicant has done absolutely everything possible to mitigate the development's impact, but whether it has taken "generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." UPC Vermont Wind, 2009 VT 19, ¶24. Shires Housing has taken reasonable steps to mitigate the Project's impacts by using an architectural design that fits in with the

neighborhood and placing the more intense use—the two multi-unit apartment buildings—in the interior of the block to minimize the visual impact.

The Court therefore finds that while the Project's impacts on the aesthetics of the neighborhood and the historic district are adverse, they are not unduly adverse. The Project therefore complies with 10 V.S.A. § 6085(a)(8)(A).

e. *The Project will not cause an unreasonable burden on the ability of the Town of Bennington to provide educational services.*

Question 8 of the Neighbors' Statement of Questions ask whether the Project will cause an undue adverse impact on the Town's ability to provide essential educational services as a result of the proposed number of residents and school-aged children. This question is nearly identical to Question 6, which was previously discussed in Part II. c. We conclude that the Project will not cause an unreasonable burden on the Bennington schools.

f. *The Project will not cause an unreasonable burden on the ability of the local government to provide municipal or governmental services.*

Question 9 of the Neighbors' Statement of Questions asks whether the Project will cause an undue adverse impact on the Town's ability to provide essential municipal services. At the end of trial, the Court granted a verbal motion from Attorney Fisher for the Neighbors to withdraw Question 9 and we therefore do not consider it here.

g. *The Project will not significantly affect the Town of Bennington's or the region's existing or potential financial capacity to accommodate the additional residents.*

Question 10 of the Neighbors' Statement of Questions asks whether the Project will place an undue burden on the Town of Bennington's tax base, given that four to five houses would reap equivalent property taxes with fewer people. Given that Act 250 does not directly address the comparison requested by the Neighbors, we interpret their question to raise Criterion 9(A) issues.

Criterion 9(A) requires us to:

take into consideration the growth in population experienced by the town and region in question and whether or not the proposed development would significantly affect their existing and potential financial capacity to reasonably accommodate both the total growth and the rate of growth otherwise expected for the town and region and the total growth and rate of growth which would result from the development if approved.

10 V.S.A. § 6086(a)(9)(A). The plain language of criterion 9(A) requires us "to consider the growth caused by the project . . . , the anticipated costs to the town and region, and the financial capacity of the town and region to accommodate the growth." In re Wal-Mart Stores, Inc., 167 Vt. 75, 82 (1997). Under criterion 9(A), growth is interpreted to include economic growth as well as population growth. Id. at 85. The statute also directs a district commission, and this Court considering an appeal, in approving a permit, to ensure that there is no "undue burden upon the town and region in accommodating growth caused by the proposed development or subdivision." 10 V.S.A. § 6086(a)(9)(A).

In reviewing this amendment application, the Court notes that the Project, with fewer units than previously permitted, does not constitute a change that will significantly affect the Town's financial capacity to reasonably accommodate the additional residents.

Shires Housing provided both an estimate of the property taxes the Project will generate ($24,000), and the Town Manager's assurance that the Town of Bennington has the capacity to provide, without unreasonable burden, fire protection, police protection, road maintenance and solid waste disposal to the Project. The Neighbors did not rebut this evidence. The Court therefore concludes that the Project satisfies Criterion 9(A).

> h. *The Project is in conformance with the Bennington Town Plan.*

Question 11 of the Neighbors' Statement of Questions asks whether the Project's density is supported by and consistent with the Bennington Town Plan, even though the Plan does not state a need for high-density housing as infill in historic neighborhoods. Question 12 asks whether the Town Plan allows for placement of high-density housing as infill in a historic neighborhood. These questions address Criterion 10, which asks whether a proposed project is "in conformance with any duly adopted local or regional plan or capital program under 24 V.S.A. chapter 117." 10 V.S.A. § 6086(a)(10).

There are several "key principles" used to guide the determination of whether a project complies with a local plan. In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520. First, a determination of nonconformity must be "based upon a 'specific policy' set forth in the plan." Id. (quoting In Re Green Peak Estates, 154 Vt. 363, 369 (1990)). Second, the specific policy must be stated "in language that 'is clear and unqualified, and creates no ambiguity.'" Id. (quoting In re MBL Assocs., 166 Vt. 606, 607 (1997)). Third, while "[b]road policy statements phrased as 'nonregulatory abstractions'" . . . may not be given 'the legal force of zoning laws,'" Id. (quoting In re Molgano, 163 Vt. 25, 31 (1994)), zoning bylaws are "designed to implement the town plan, and may provide meaning where the plan is ambiguous." In re Kisiel, 172 Vt. 124, 130 (2000).

Abstract policy statements in town plans that lack specific enforcement standards cannot be enforced under Criterion 10. In re Pion Sand & Gravel Pit, No. 245-12-09 Vtec, slip op. at 18 (Vt. Super. Ct. Envtl. Div. July 2, 2010) (Durkin, J.). A project only conflicts with a plan when the plan's standards are stated in clear, unqualified language that creates no ambiguity. Id. "[B]road policy statements and nonregulatory abstractions are not equivalent to enforceable restrictions." In re B & M Realty, LLC, 2016 VT 114, ¶ 35 (Vt. Oct. 21, 2016) (quoting In re Chaves A250 Permit, 2014 VT 5, ¶ 38, 195 Vt. 467)

The applicant provided evidence at trial that shows the Project is in conformance with the Town Plan. For instance, the Project is located in the Town's MR District. According to the Town Plan, the MR District is intended to provide compact residential development and may include "apartments, row houses, and similar types of housing." Town Plan Chapt. 3.2, Applicant Ex. 28, 22. "Relatively high densities [are] allowed for development of multi-family housing." Id. In the Town Plan's "Housing Policies and Recommendations" section, it encourages the creation of "infill housing opportunities" that are "compatible with the character of the town." Id. Chapt. 5.5, Applicant Ex. 28, 58–9. The Town Plan does not relegate infill housing to any specific district. The Project complies with these Town Plan provisions even though they may be more aspirational than mandatory.

The Neighbors offered testimony by Donald R. Miller, a homeowner on Grandview Street who has served on planning and zoning commissions in Connecticut and Vermont and owns an insurance agency in downtown Bennington. Mr. Miller focused the Court's attention on several sections of the Town Plan: Sections 3.3(1) and (3) (Land Use Policies and Recommendations);

5.5(1), (2) and (9) (Housing Policies and Recommendations); and 6.7 (6) (Transportation Policies and Recommendations). None of these sections, however, state a specific policy or standard for density in the Project area, the issue specifically raised in Neighbors' Questions 11 and 12. Section 3.3(1) comes closest, stating that "all development activity shall conform to the requirements and restrictions on uses, densities, and dimensional, design, and special standards as indicated" in the Regulations. Criterion 10, however, does not require us to determine whether a project conforms with the detailed requirements of the Town's Regulations. See Horizon Development Corp., No. 4C0841-EB, Mem. of Decision, at 29 (Vt. Envtl. Bd. Aug. 21, 1992).

The Court concludes that Project conforms with the Town Plan. For a further discussion of the Project's compatibility with the character of the area, including the historic nature of the area, see the discussion, *supra* Part I. a(2). We therefore conclude that the project complies with Criterion 10.

### III. Shires Housing's Act 250 Permit Appeal

In its appeal of the District Commission's Act 250 permit decision, the applicant asks three questions in its Statement of Questions pertaining to the conditions attached to the permit.

#### a. *Blasting Conditions*

Question 1 asks what blasting conditions for construction are reasonable, ascertainable, and consistent with industry standards and practice. With this question, Shires Housing appeals Conditions 15 and 16 on its Act 250 permit, which require it to retain a trained, certified and licensed blasting and drilling contractor to prepare a comprehensive blasting plan to "ensure there will be no physical damage to any historic homes within or adjacent to the subject parcel;" and retain an independent, third-party consultation for survey, inspection, monitoring, damage assessment, and reparation.

Criterion 8 of Act 250 requires that a proposed development not have an undue adverse effect on historic sites. 10 V.S.A. § 6086(a)(8). In its appeal of the Act 250 approval, Shires Housing does not challenge the District Commissions conclusion of an adverse impact under Criterion 8. Similarly, this Court's above findings of fact show that the Project's potential blasting

could have an adverse impact on neighboring historic homes by causing factures in foundations or basements or walls.   Our review of Shires Housing Question 1 therefore relates to whether Shires Housing has offered a blasting plan or blasting procedures (Shires Exhibits 26 and 27) that qualify as generally available mitigating steps which a reasonable person would take to eliminate or reduce the adverse impacts to neighboring historic structures.  Times & Seasons, 2008 VT 7, ¶ 8 (explaining that if an adverse aesthetic impact is found, the impact may not be undue if the applicant takes generally available mitigating steps which a reasonable person would take to improve the harmony of the proposed project with its surroundings); see also, Re: Barre Granite Quarries, LLC, No.  7C1079-Revised-EB, Findings of Fact, Conclusions of Law, and Order, at 89 (Vt. Envtl. Bd. Dec. 8, 2000) (finding that detailed blasting procedures will safeguard against unduly harmful impacts of a quarry on neighboring land uses).

Shires Housing offers a blasting protocol, set forth in Finding of Fact number 60, and contends that the protocol satisfies Criterion 8's mitigation requirement that adverse impacts must be mitigated with generally available steps which a reasonable person would take.  As such, Shires Housing asserts that the District Commission does not have the authority to require an independent third party to oversee damage claims and reparations.   Shires Housing acknowledges that if the pre- and post-surveys ascertain that damage to a neighboring structure has occurred, it is the obligation of Shires Housing (and the blasting contractor) to cure the damage.

The Court concludes that requiring an independent, third-party consultant to oversee damage claims and reparations—in addition to a seismic survey or blasting firm to carry out the blasting protocol—is beyond generally available mitigation which a reasonable person would take.  The neighbors testified that they wanted an independent third party to assist with the potential damage to their homes caused by blasting.  DHP's December 10, 2015 offers that the pre- and post-blasting surveys and monitoring should be managed by an independent third party who would also assess damage and corrective action.  No justification is provided as to why the independent professional blasting firm is not qualified or appropriate to manage these issues. The Court is without evidence supporting the need to have two layers of professional independent consultants hired by the developer.  Accordingly, the Court strikes conditions 15 and 16 of LUP #8B0573-3.   The Court imposes as a condition of approval the blasting protocol

set forth at Finding of Fact number 60 above. The Court imposes the additional requirement of providing copies of both the pre- and post-blast surveys to property owners. With these conditions of approval, we conclude that the Project complies with 10 V.S.A. § 6086(a)(8).

b. *Shires Housing may use composite materials instead of wood for the exterior siding and trim on the Project's duplexes and apartment buildings.*

Question 2 asks whether composite materials instead of wood can be used for the exterior siding and trim on its buildings.

Condition 14 of the Act 250 permit requires Shires Housing to use wood siding and wood trim "in order to be compatible with the historic architectural character of the South Street Historic District, as well as adjacent historic homes on Grandview and Silver Streets." This condition is imposed pursuant to Criterion 8, which requires that a proposed development not have an undue adverse effect on the aesthetics and historic sites in the area. 10 V.S.A. § 6086(a)(8). VDHP, in a Dec. 10, 2015 Letter to District #8 Environmental Commission Acting Chairman John S. Liccardi, recommended that wood siding and trim "are the appropriate materials for significant new construction within the historic district in order to minimize these aesthetic concerns."

Shires Housing does not challenge the District Commission's conclusion of an adverse impact under Criterion 8 with respect to the Project's compatibility with the historic architectural character of the South Street Historic District. The question relates to generally available mitigating steps which a reasonable person would take to improve the harmony of the proposed project with its surroundings. Shires Housing offered testimony that the aesthetic differences between wood and composite materials are nearly undetectable, while the maintenance costs of composite materials are much lower. Shires Housing asserts that requiring wood siding and trim is not reasonable mitigation. Little additional evidence was offered on this topic by other parties. VDHP did not appear at or participate in trial, and therefore, did not offer additional evidence. Because the aesthetic differences are nearly undetectable, we conclude that requiring wood is not a generally available mitigating steps which a reasonable person would take to eliminate adverse impacts. Rather, the critical mitigating requirement is ensuring that the aesthetic appearance of the materials used look like the historic character of the area. Based

upon the evidence, Shires Housing's use of composite materials is allowable. We therefore modify Condition 14 of LUP #8B0573-3 by striking "wood siding and wood trim" and replacing it with "composite material having the appearance of wood."

c. *The number of parking spaces permitted for the Project is 46.*

The District Commission incorrectly identified the number of parking spaces the Project will have. The number of parking spaces is 46.

## Conclusion

In summary, in consideration of the Neighbors appeal of the municipal application, the Court concludes that the Project will not have an adverse impact on community facilities or services, the character of the neighborhood, or traffic. The Project can be used for its intended purpose without danger to public health or safety, the environment, neighboring properties, the character of the area or district in which it is located. The Project is not consistent with the Town of Bennington's setback requirements, but as a PRD, is exempt from those requirements. The Project meets the minimum requirements for a PRD. The Project will not create an undue burden on municipal facilities or create an unreasonable demand for public services. Shires Housing does not need to provide a fiscal impact analysis of the Project. The site design does not lack continuity and does not create a dysfunctional layout. Condition 7 requires Shires Housing to file a blasting plan with the Town for approval without notice to and opportunity to be heard for other interested parties in violation of due process protections. We therefore **VOID** Condition 7 within the PRD and zoning approval #14-141 for this infirmity.

In consideration of the cross-appeals of the Act 250 application, the Court concludes that the Project will not result in undue air pollution. The Project will not cause unreasonable congestion or unsafe conditions with respect to the use of the highways and other means of transportation. The Project's multi-unit apartment buildings will not have an undue adverse effect on the neighborhood's aesthetics or historic sites. The Project will not have an undue adverse impact on education or cause an unreasonable burden on the ability of the Town of Bennington to provide essential educational services. The Project will not cause an unreasonable burden on the ability of the local government to provide municipal or governmental services. The

Project will not place an undue burden on the Town's tax base and will not significantly affect the Town of Bennington's or the region's existing or potential financial capacity to accommodate the additional residents. The Project conforms with the Bennington Town Plan. The Bennington Town Plan allows for infill development and high-density housing at the Project's site, which is in the MR District. Shires Housing is required to follow the blasting protocol as described in the Findings of Fact Number 60 and in these conclusions, and is not required to hire an independent, third-party consultant; Condition 15 and 16 of LUP #8B0573-3 are **VOIDED**. Shires Housing may use composite materials instead of wood for the exterior siding and trim on the Project's duplexes and apartment buildings. We **MODIFY** Condition 14 of LUP #8B0573-3 by striking "wood siding and wood trim" and replacing it with "composite material having the appearance of wood." The number of parking spaces permitted for the Project is 46.

Because there is a potential for blasting to adversely impact neighboring properties, Shires Housing's municipal and Act 250 approvals are subject to the following conditions (Blasting Protocol):

1. A seismic survey or blasting firm shall be employed by Shires Housing to perform and monitor the explosive work. The firm(s) shall have a minimum of five years of experience in similar rock work, show proof of license to handle explosives and show proof of adequate liability insurance.

2. The seismic or blasting firm(s) shall conduct a pre-blast survey of all buildings or water supplies within 500 feet of the work area. The survey shall include, but not be limited to, video tapes, pictures and notes which identify the existing condition of all structures and portions thereof. A post-blast survey shall be conducted to determine the condition of all structures and portions thereof after blasting. Copies of the pre- and post-blast surveys shall be provided to the owners of subject buildings and the Town Zoning Administrator.[17]

3. All work shall conform to all applicable codes for explosive handling and use including, but not limited to, NFPA 495; all local, state and federal regulations; and the procedures outlined in the "Blasters Handbook" by the Dupont Company.

---

[17] The Court imposes the additional requirement of providing copies of both the pre- and post-blast surveys to property owners and the Town.

4. The drilling and/or seismic survey firm(s) shall notify all abutting property owners and residents seven days in advance of any drilling or blasting activities. The local police and fire departments shall be notified 24 hours in advance of any blasting. Signs shall be posted at all entrances at least 500 feet from the work area advising of blasting and describing the warning whistle before a blast. Drilling and blasting shall not commence until a pre-blast survey is complete.

5. Drilling operations shall be conducted Monday through Friday 7 a.m. to 5 p.m. Explosive detonations shall be limited to 9 a.m. to 4 p.m. Monday through Friday.

6. The blasting and/or seismic survey firm(s) shall maintain two continuous recording seismographs on site during explosive detonation. The seismic record shall be reviewed by an Engineer qualified to assess accelerations produced by explosive shock waves.

7. No blasting of any kind will be conducted without appropriately sized blast mats or adequate backfill to prevent fly rock of any kind.

8. The blasting firm shall keep daily records of hole location, depth, explosive load, weight per delay per hole, the type of subsurface materials and any unusual event during an explosive detonation.

9. There shall be no overnight storage of explosive material on the site except in containers which conform to NFPA 495[18].

10. The determination of maximum charge weight per delay shall be generally based on the formula proposed by the American Insurance Association or current regulations.

---

[18] NFPA 495 is a code adopted by the National Fire Protection Association that identifies reasonable levels of safety for the manufacture, transportation, storage, sale, and use of explosive materials.

11.	The company employed by Shires Housing to perform any blasting work shall follow the State of Vermont's Best Management Practices for Blasting to Avoid Environmental Contamination.

We remand these matters to the Town and the District Commission to perform the ministerial act of issuing permits consistent with each decision below as modified by this decision.

This completes the matter before the Court.	A Judgment Order is issued contemporaneously with this decision.

Electronically signed on April 14, 2017 at 2:31 PM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division